IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

OTIS C.,
    Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,
    Defendant.

Case No. 4:18-cv-04215-SLD-JEH

**Report and Recommendation**

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 9) and the Defendant's Motion for Summary Affirmance (Doc. 11). This matter has been referred for a report and recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Plaintiff's Motion for Summary Judgment be denied and the Defendant's Motion for Summary Affirmance be granted.[1]

**I**

Plaintiff Otis C. filed his application for supplemental security income (SSI) on January 28, 2015 and alleged disability beginning on July 13, 1999. His claim was denied initially on July 2, 2015 and upon reconsideration on October 1, 2015. Otis filed a request for hearing concerning his SSI application on November 24, 2015. A hearing was held before the Honorable Deborah Giesen (ALJ) on May 15, 2017. At that hearing, Otis was represented by an attorney and Otis as well as a vocational expert (VE) testified. Following the hearing, Otis' claim was denied on

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 6) on the docket

1

October 4, 2017. His request for review by the Appeals Council was denied on September 14, 2018, making the ALJ's Decision the final decision of the Commissioner. Otis filed the instant civil action seeking review of the ALJ's Decision on November 12, 2018.

## II

At the May 2017 hearing, Otis was 48 years old and lived in an apartment with his mother and nine-year-old nephew. He claimed the following physical conditions limited his ability to work: gunshot wounds from knees to chest; severed nerve – right leg and foot; "[c]an't stand on right leg for any amount of time;" left foot pain – a result of the issues with right leg; and high blood pressure. AR 185. Otis testified that he "[g]ot gunned down[2] in another state which caused [him] not to be able to do any work." AR 32-33.

He testified he did not receive his diploma following the 12th grade as he was short one credit. He did not have a driver's license and did not have one since 1990 when it was taken due to back child support. He agreed that he had not done any work in the last 15 or 16 years. The ALJ stated to the VE that she found no substantial gainful activity during the relevant period such that there was no past relevant work to be considered in this case. Otis testified he was unable to work because he had chronic pain in his right leg, he had to elevate his legs above waist level "half of the month" to get rid of some of the pain, he could not carry anything because that action added to the pain and pressure in his foot, and he experienced swelling in his foot if he tried to do any activities. AR 34. In response to the ALJ's question of how often Otis elevated his right foot, he answered, "If I walk on it a half hour or try an hour, then I have to get off of it for just as long." AR 34. He

---

[2] Otis testified this occurred in 1997. AR 33.

said his medications masked his pain, but the pain did not ever go away. "Some days it's worse than others." *Id*.

He took Ibuprofen 800, nerve pills, pain pills, and blood pressure medication. The ALJ noted the record included that Otis was seen by physical therapy in April 2015, and she asked what happened with that therapy. Otis responded that it did more harm than good and caused his foot and leg more pain so "they" had to stop the therapy. AR 40. He was referred to a pain specialist "probably" about two years before the hearing, and he saw that doctor every three to six months. AR 41. He said his prescribed TENS unit did more harm than good. He said his pain specialist kept working on new things to help relieve his pain. Otis stated that nothing other than putting his foot up and relaxing relieved his pain.

During the day, Otis sat in a recliner and put his feet up, and he tried to do "little things" but the pain aggravated him too much and so he really could not do much. AR 42. He said he tried to take walks though they just made his pain worse. He said that his pain never went away and instead just "shoots at different levels at different times." *Id*. He said his doctors told him they were going to keep trying to figure out how to relieve some of his pain.

Upon questioning by his attorney, Otis testified to how long a period of time he elevated his legs on the days he had to do so. He clarified that there were days he did not have to elevate his legs because the pain was not as bad as it was on a prior day though was still there. He said his cane was prescribed by Michael J. Bollaert, M.D. and he used it with his left hand to try and take pressure off the right side. Otis testified he could "maybe" stand a total of three hours in a day. AR 47. The ALJ then questioned Otis more about his cane. Otis testified he had been using it for "two years, maybe a little longer." *Id*. Otis also testified that Dr. Bollaert advised him a couple years before the hearing to elevate his legs. He

3

clarified that the doctor told him to just elevate the right leg, but Otis elevated both because "it help[ed] [him] more with the pain to have them both up." AR 48. As for anything else that Otis felt kept him from working, he answered, "Not really, it's I just can't stand." *Id*. He elaborated that he could not stand on the right foot for very long, and if he could stand he would be able to do a lot of things.

The ALJ also noted the fact that Otis' disability application indicated he became disabled in 1999 but he did not apply until 2015. The ALJ asked if something had changed. Otis responded it did not, that he applied once after he moved (and was denied), and he never went back to re-apply because "the pain was really bad right at that time and [he] couldn't even walk a step at that time at all when after the incident first happened so it really had [his] mind and body really out of it." AR 48-49.

> The VE was then questioned. The ALJ asked the VE to assume:

> An individual who was 46 years of age at the date of the application, 30 years of age as of the alleged onset date of disability, and is currently 48 years of age with an 11th grade education and no past work; who has the capacity – no past relevant work. Who has the capacity for light work as defined in the regulations with no climbing ladders, ropes, or scaffolds; frequently climbing ramps, stairs, balancing, stooping, kneeling, crouching, and crawling; no working around hazards such as unprotected heights, open flames, or dangerous moving machinery; and no operating, driving a motor vehicle.

AR 50-51. The VE answered there were jobs available and identified three at the light level. The ALJ added to the hypothetical that the individual at the light level needed "kind of a sit/stand option every half hour, needed to change positions or an opportunity at least to change position[.]" AR 51. The VE answered that one job would be eliminated, one would be reduced by 50 percent, and the third would be reduced by approximately 40 percent. The ALJ next added to the hypothetical

4

that the individual would need to use a cane in the dominant hand for ambulation but did not have a sit/stand option. The VE answered the first job would be eliminated, the second would be reduced by approximately 20 percent, and the last would be reduced by about 75 to 80 percent. The ALJ added the sit/stand option back into the hypothetical with cane use for ambulation. The VE answered the first job would remain eliminated, the second reduced by about 85 to 90 percent, and the third similarly reduced by 85 to 90 percent. The VE emphasized those were "guesstimates" on her part gained from her formal education and over 25 years of experience as a certified rehabilitation counselor. AR 53. The ALJ then added that the individual at the light level be allowed to elevate his leg outside of breaks or lunches. The VE responded that at Otis' height, she did not believe he could elevate his leg straight out and be underneath a traditional desk. The VE also provided that there were unskilled, sedentary jobs that allowed for the elevation of the legs other than during a break. Additionally, the VE did not believe the need to use a cane for ambulation impacted the sedentary occupational base.

    In response to Otis' attorney's question, the VE testified that there were some light jobs classified in the Dictionary of Occupational Titles as light work, "but in today's world they allow for sitting or standing, so there might be some there that an individual could do in a seated position." AR 56. The VE provided that an individual's need to elevate his leg about 19 inches while seated would "probably" preclude those sedentary jobs. AR 57. Lastly, the VE provided that, in her opinion, the occupations identified would be eliminated if the individual had to use a cane in the dominant hand in a light work setting to stand as well as to ambulate.

## III

In her Decision, the ALJ determined Otis had the following severe impairments: peripheral neuropathy of right foot and hammertoes of right foot. AR 15. The ALJ made the following residual functional capacity (RFC) assessment:

> [T]he claimant has the [RFC] to perform light work as defined in 20 CFR 416.967(b). He requires a sit/stand option every half hour. He cannot climb ladders, ropes, or scaffolds. He is limited to frequent climbing ramps or stairs, balancing, stooping, kneeling, crouching, or crawling; no work around unprotected heights, open flames, or dangerous moving machinery; and no driving a motor vehicle.

AR 16. The ALJ explained that Otis alleged gunshot wounds from his knees to his chest, a severed nerve to his right leg and foot, left foot pain, and the inability to stand on his right leg at all limited his ability to work. She next included a summary of his testimony pertaining to his efforts to relieve his leg pain (leg elevation), what worsened his pain (sitting and walking and carrying anything caused swelling), and what ability he retained to walk (only one-half hour).

In order to assess Otis' RFC, the ALJ discussed medical records dated February 4, 2015, February 12, 2015, March 26, 2015, July 8, 2015, August 6, 2015, and October 5, 2016. Throughout that time, Otis complained of pain in his right foot and leg. In February 2015, he exhibited decreased right foot range of motion, but had no pain on palpation of his right foot. He was in no distress upon examination, ambulated with a cane at the examination, and walked with a normal gait at an appointment in July 2015. Also, at that time, he had hyperesthesia[3] to

---

[3] Hyperesthesia is defined as a distortion of touch "consisting of increased sensitivity, particularly sensation from a normally painless touch stimulus." DORLANDS.COM, https://www.dorlands.com/dorlands/wsearch.jsp?searchtype=words&searchterm=hyperesthesia (last visited Nov. 19, 2019).

6

pinprick at the base of the great, second, and third toes, and allodynia[4] of the right leg but normal range of motion. He had no abnormalities to his extremities upon examination in August 2015, and his neurological examination was grossly normal at that time. The ALJ recited what medicines were prescribed to Otis between February 2015 and August 2015 and what other treatments were offered including a referral to physical therapy in March 2015 and a TENS unit ordered in July 2015.

       The ALJ also discussed Otis' June 13, 2015 consultative examination which resulted in the consultative examiner diagnosing him with peripheral neuropathy, right lower extremity, and hammer toes on the right five toes. Upon examination at that time, Otis walked greater than 50 feet with a non-antalgic gait and without the use of an assistive device, exhibited normal range of motion of his hips, knees, and left ankle but decreased right ankle range of motion, displayed full 5/5 lower extremity strength, had normal deep tendon reflexes, and had mild difficulty walking on his heels, squatting and arising, and getting on/off the examination table. He complained of severe pain and was unable to complete vibratory, proprioception[5], and pinprick sensation tests of the right foot.

       The ALJ later further detailed Otis' hearing testimony. Finally, she addressed the State Agency medical consultants' opinions at the initial and reconsideration levels. The ALJ gave the initial State Agency medical consultant's opinion that Otis could do light work with no climbing ladders, ropes, or scaffolds "great weight" because it was supported by the medical records. AR 19. The ALJ observed that the record did not identify significant problems with standing or

---

[4] Allodynia is defined as "pain resulting from a non-noxious stimulus to normal skin." DORLANDS.COM, https://www.dorlands.com/dorlands/def.jsp?id=100003035 (last visited Nov. 19, 2019).
[5] Proprioception is defined as "the perception of the position and movements of the body." OXFORD ENGLISH DICTIONARY, https://www.oed.com/view/Entry/267353?redirectedFrom=proprioception#eid (last visited Nov. 19, 2019).

walking. The ALJ then gave the later State Agency medical consultant's opinion (at the reconsideration level) that Otis could perform light work with limited pushing/pulling in the lower extremities, again no climbing ladders, ropes, or scaffolds, and frequent stooping and crawling with no concentrated exposure to extreme cold or heat, vibrations, or hazards such as machinery or heights "great weight to the extent that it [was] consistent with the . . . RFC [set forth in the Decision]." *Id.* The ALJ also explained she "accommodated the claimant's peripheral neuropathy of right foot and hammertoes of right foot by limiting him to light work." *Id.*

## IV

Otis argues: 1) the ALJ erred in failing to address with the required specificity Otis' need to alternate positions; and 2) substantial evidence does not support the ALJ's finding that Otis' testimony is inconsistent with the record.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

8

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. § 416.966. The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 416.920. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe or whether a combination of her impairments is severe;

3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4) is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5) is unable to perform any other work existing in significant numbers in the national economy.

*Id.* An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, Otis claims error on the ALJ's part at Step Four.

### A

Otis first argues that the ALJ erred where she found he required a sit/stand option every half hour but did not specify how long he would need to sit or stand every half hour. He points out that the need to alternate positions does not eliminate all jobs in the economy but simply erodes the light and sedentary occupational base. He additionally points out that at the time of the ALJ's Decision, Otis was a younger individual but during the pendency of his appeal he attained the age of 50. Thus, Otis argues, at age 50 the grid rules would mandate a disabled finding if he were limited to sedentary work; hence his entitlement to an accurate representation in this case of his need to alternate between sitting and standing. The Commissioner counters that Otis' argument misapprehends the nature of the limitation which allows a worker to alternate between sitting and standing rather than engaging in the prolonged sitting of sedentary work or the prolonged standing of light work. Per the Commissioner, the ALJ's sit/stand option gave Otis the opportunity to change positions every half hour, and he could use that opportunity however he saw fit; the ALJ was not required to provide any more specificity than she did. Further, the Commissioner argues no objective or

opinion testimony supported the conclusion that Otis could not perform light work if given the option of changing between seated and standing positions every half hour, and thus his arguments about the application of the grid rules are unavailing.

As he makes abundantly clear in his brief, Otis is concerned about the ALJ's "inexact" sit/stand formulation given the *res judicata* effect of her RFC. He says the inability to accurately determine the erosion of the sedentary and light work bases prejudices the adjudication of his claim should this Court remand his case or should he make a new application (given his attainment of age 50). Though Otis highlights the particular circumstances in this case to bolster his argument that the ALJ's sit/stand option lacked sufficient specificity, those particular circumstances do not somehow expand the ALJ's duty under the relevant rulings.

SSR 83-12 provides, in relevant part:

> In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)
>
> . . . In cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base.

SSR 83-12, at *4. SSR 96-9p provides, in relevant part:

> **Alternate sitting and standing:** An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by

11

> scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. *The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing.* It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

SSR 96-9p, at *7 (emphasis added). In *Ketelboeter v. Astrue*, the Seventh Circuit Court of Appeals rejected the claimant's contention that the ALJ was required to describe how often he would need to change position. 550 F.3d 620, 626 (7th Cir. 2008). The ALJ told the VE to assume the claimant would "have to have a sit, stand option where he could sit or stand as needed during the day." *Id.* The *Ketelboeter* court reasoned:

> But a job in which [the claimant] could sit or stand "as needed" would necessarily encompass frequent sitting and standing. Changing positions "as needed" allows an employee broad flexibility and thus has a more restrictive effect on the jobs available to him than the limitation [the claimant] thinks the ALJ should have described.

*Id.* at 626; *see also Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) (rejecting claimant's argument that the ALJ's analysis was deficient because he did not specify the frequency with which she would need to alternate between sitting and standing where the ALJ included a restriction for the claimant to work that allowed her the opportunity to sit or stand at her "own option"). Since then, the Seventh Circuit has determined that "[a]n RFC must be specific about the required frequency of standing and sitting." *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012) (citing SSR 96-9p and finding *not* sufficiently specific an RFC which provided the claimant must be able to alternate between sitting and standing "throughout the workday").

Here, the ALJ complied with SSR 96-9p where her RFC finding included that Otis "requires a sit/stand option every half hour." AR 16. To the extent Otis believes the RFC fell short because the ALJ did not specify how long he would need to sit before being able to stand again or how long he must stand before sitting, such specificity is not called for where the Seventh Circuit has held sit/stand "as needed" and at the claimant's "own option" were sufficiently specific. *See also Ray v. Colvin*, 219 F. Supp. 3d 825, 836 (N.D. Ill. 2016) (finding the ALJ followed SSR 96-9p "to the letter" where the ALJ defined the frequency with which the claimant had to change positions as "at will" and stating "[the claimant's] argument—that an ALJ has to specify exact time periods a claimant must stand or sit, such as 15 minutes standing, 45 minutes sitting—has been rejected by the Seventh Circuit on more than one occasion"); *Buchholtz v. Barnhart*, 98 F. App'x 540, 547 (7th Cir. 2004) (affirming ALJ's decision in which ALJ properly took into account the erosion of the occupational basis by having a VE testify to the possible jobs for an individual restricted to alternating between sitting and standing every 20 to 25 minutes). Notably, Otis cites no authority within the Seventh Circuit in support of his argument that the ALJ's sit/stand option every 30 minutes was not specific enough. Also of note is the fact that Otis himself testified, "If I walk on [his right foot] a half hour or try an hour, then I have to get off of it for just as long." AR 34. A commonsense reading of the ALJ's sit/stand option was, as the Commissioner argues, that Otis could stand for increments no longer than 30 minutes at a time if he so chose. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (providing an ALJ's opinion is to be given "a commonsensical reading rather than nitpicking at it"). Lastly, there was no indication at the hearing that the VE was unable to opine as to the implications for (erosion of) the occupational base due to the hypothetical individual's need for a "sit/stand option every half hour, need[] to change positions or an opportunity at least to change

13

position." AR 51. Remand is therefore not required to command the ALJ to further specify how long Otis must sit between bouts of standing.

## B

Otis next argues that because there were no material inconsistencies with the record as a whole, the ALJ did not have substantial evidence to support her finding that Otis' testimony was inconsistent with the record. As with his first argument, Otis argues because of *res judicata*, it is imperative that his ability to stand for prolonged periods be properly adjudicated in his current claim; he says the fundamental issue is whether his allegation that he cannot stand for the time necessary to do light work is consistent with the record as a whole. The Commissioner argues the ALJ reasonably considered the objective medical evidence, reasonably weighed the medical opinion evidence, and did not reversibly err in her subjective symptom analysis.

SSR 16-3p directs the ALJ to focus on the "intensity and persistence of the applicant's symptoms." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). SSR 16-3p provides that all the evidence, including objective medical evidence, is to be considered in evaluating the intensity, persistence, and limiting effects of an individual's symptoms and also the factors set forth in 20 C.F.R. § 416.929(c)(3) are to be considered including: the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; medications and their side effects; non-medication treatments; any other measures used to relieve pain or other symptoms; and any other factors concerning the claimant's functional imitations and restrictions due to pain and other symptoms. SSR 16-3p, at *7-8.

The ALJ explained that Otis' allegations were inconsistent with the evidence of record as the "record simply does not support his allegations of debilitating pain and inactivity." AR 18. Of significance was that there was no clinical evidence of

14

the severed nerve to which Otis testified, no x-rays of his lower extremities in the medical record, and no electromyography (EMG) in the record to determine the severity of his neuropathy. She pointed out some of his physical examinations of his extremities were normal, and as recently as October 2016, he had full range of motion of them. The ALJ also noted Otis' testimony that he was advised by a treating doctor to elevate his legs and the fact that the medical records did not support that testimony. To further contradict his testimony was the fact that examinations did not document swelling or edema in the lower extremities that would indicate the need to elevate the extremities, and he was advised to exercise four to five days a week for 20 to 30 minutes each day, again as recently as October 2016. The ALJ next discussed the conflict between Otis' presentation at the hearing with a cane and his report that he was prescribed such a couple years before and the lack of documentation of a cane prescription or recommendation that he use a cane. Moreover, Otis had a non-antalgic gait and did not require use of an assistive device at the June 2015 consultative examination. After that, he exhibited normal gait at a doctor's visit in July 2015. The ALJ considered Otis' treatment "routine and conservative," citing his testimony that he took Ibuprofen, 800 milligrams, nerve pills, and pain pills, and that a TENS unit did more harm than good. As for Otis' daily activities, the ALJ found his testimony in that regard to be inconsistent, noting that in an April 2015 Function Report he reported he did not perform household chores because of intense pain but at his consultative examination he reported that he cooked, cleaned using a mop, broom, or vacuum, and shopped. The ALJ explained she found "factors other than activities of daily living . . . to be more persuasive in assessing subjective symptoms and complaints and reaching the conclusion regarding the claimant's [RFC]." AR 18.

It is clear to the Court what evidence the ALJ considered and how she reached her conclusions. *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005)

("In rendering a decision, the ALJ must build a logical bridge from the evidence to his conclusion").

The Court addresses each of Otis' discrete arguments disputing that the ALJ relied upon substantial evidence in discounting his testimony. First, the ALJ certainly was permitted, and in fact required, under SSR 16-3p to consider the objective medical evidence in her analysis of the intensity and persistence of Otis' symptoms. *See, e.g.* SSR 16-3p, at *4 ("In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence"). Though Otis would have it otherwise, the Court cannot consider in a vacuum the ALJ's one reason, *among others*, that there was no clinical evidence, x-rays, or EMG. *See Rice*, 384 F.3d at 370 n. 5 (stating it is proper to read the ALJ's decision as a whole). As illustrated above, the ALJ pointed to more than such a lack of objective medical evidence; she pointed to substantial evidence.

Second, it is true that the ALJ did not include in her summary of Otis' testimony that he testified to good and bad days, and thus the ALJ did not pass judgment on whether such testimony was consistent with the record. Otis argues that it is clear he could not stand for six hours per day on a sustained basis if his testimony regarding good and bad days is given credit. Otis' argument in this regard essentially ignores the fact that the ALJ included a requirement in the RFC of a sit/stand option every half hour. Furthermore, the ALJ was not required to discuss every piece of evidence. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("an ALJ need not mention every piece of evidence, so long he builds a logical bridge from the evidence to his conclusion"). Instead, the ALJ was required to *evaluate* all the evidence to determine the intensity, persistence, and limiting effects of Otis' symptoms. SSR 16-3p, at *7. The ALJ did so here where she explained how Otis' testimony, his daily activities, the medical evidence, and the

16

opinion evidence all considered together showed he retained the RFC the ALJ formulated. The fact that none of Otis' examiners hinted that he was exaggerating his claims of pain does not render the ALJ's subjective symptom evaluation wrong; it was ultimately her responsibility to determine Otis' functional limitations and restrictions due to pain and other symptoms.

Third, any shortcoming in non-examining State Agency Prasad Kareti, M.D.'s opinion was remedied by the ALJ's consideration and explanation of the record evidence and her findings in support of the ultimate RFC finding. Otis argues Dr. Kareti's unexplained discounting of Otis' pain in drawing his conclusions leaves his opinion lacking a vital component and was therefore not substantial evidence to support a finding that Otis' testimony was inconsistent with the record. Otis points in particular to Dr. Kareti's apparent failure to consider observations of an antalgic gait in drawing his conclusions.[6] Be that as it may, the ALJ proceeded to separately consider Otis' pain complaints and the evidence of gait issues (as was her obligation), and she concluded, on balance, the evidence did not support a standing limitation beyond that set forth in the articulated RFC. At Step Three, the ALJ explicitly acknowledged: "The claimant's impairment does not meet listing 1.02(A) because he can ambulate effectively, although there is some documentation of an antalgic gain on occasion. It is noted that this has not been consistent." AR 16.

Finally, the ALJ committed no legal error in her consideration of Otis' sparse work history, and her error in finding no documentation of a physical therapy assessment or physical therapy sessions was harmless error. With regard to Otis' work history the ALJ noted, "[T]he claimant has a poor work history. This

---

[6] In the portion of the Disability Determination form completed upon reconsideration on September 30, 2015, Dr. Kareti included under "RFC – Additional Explanation" "RECON:" a note dated 4/15/15 which provided Otis had an antalgic gait which favored his right lower extremity. AR 75 (referring to AR 332).

suggests that he lacks the motivation to work." AR 19. The ALJ noted that fact in her discussion of the several reasons she found his allegations of disabling limitations inconsistent with the record evidence. 20 C.F.R. § 416.929(c)(3) provides, in relevant part, that in evaluating the intensity and persistence of a claimant's symptoms, "other evidence" for consideration includes "information about [the claimant's] prior work record." Also, while Otis argues that the ALJ did not consider that after being shot in 1997 he was not capable of working full-time due to the residuals of his injuries, such an argument rings hollow given that he had no earnings in 1990 and 1991, before he was shot. With regard to physical therapy, the ALJ did err in her consideration of Otis' reported inability to do physical therapy because it caused him more pain; there *was* evidence in the record that at a physical therapy evaluation in April 2015, he reported pain after limited examination and so Otis was discharged from treatment. Such an error was harmless where the ALJ provided other reasons for her conclusion that the record did not support Otis' allegations of debilitating pain and inactivity (see above). *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (explaining that administrative error may be harmless and thus a court ought not remand a case to the ALJ where it is convinced that the ALJ would reach the same result). As substantial evidence supports the ALJ's Decision, remand is not warranted in this case.

V

For the reasons set forth above, it is recommended that: 1) the Plaintiff's Motion for Summary Judgment (Doc. 9) be denied; 2) the Defendant's Motion for Summary Affirmance (Doc. 11) be granted; 3) the Clerk of Court be directed to enter judgment as follows: "IT IS ORDERED AND ADJUDGED that the decision of the Defendant, Andrew Saul, Commissioner of Social Security, denying benefits to the Plaintiff, Otis C., is AFFIRMED."; and 4) this matter be terminated.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation. FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended*.

Entered on November 21, 2019.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE